Good morning. May it please the Court, Neil Saltzman for the Pellin under a 1292B order. This issue, this case presents three significant issues relating to California's Your name, I didn't quite get it on my sheet here. Neil Saltzman, S-O-L-T-M-A-N. Oh, yeah, okay, fine. I got you. Okay. Thank you. Actually, they had my middle name, too, so. Yes, Michael. Took up a lot of space. We have three significant issues that are presented in this appeal as a result of California's efforts to provide in Section 354 unique remedies for events occurring very long ago and very far away among non-U.S. residents. We think Section 354.4 is unenforceable for three different reasons, actually four in detail. First, the Supremacy Clause, as interpreted by the Supreme Court in the Giorna case and in Garamendi and this Court in the Deutsch case, in Judge Reinhardt's opinion, calls for a field preemption of California's efforts to provide special remedies for a foreign policy issue with regard to the Turkish-Armenian events of World War I era. In addition, we believe the Supremacy Clause also compels a finding that Section 354 is preempted because it conflicts with existing federal policy in two distinct ways. First, its repeated use of the genocide label clearly conflicts with the foreign policy of the Bush and Clinton administrations that to so label the events of the World War I. Let's say that label was not there. That label is there, though. Let's say it wasn't there. Yes, sir. Where would we be? I think we'd be exactly in the same place. Why? We'd be in the same place because we have, putting aside the label, a special cause of action that is designed solely to remedy events relating to the war. So if you take out the label, you still have a cause of action that applies only to people who had claims in Armenia resulting in a certain period of time between 1915 and 1922 or 1923, who have a special statute of limitation that applies solely to them. Those claims, putting aside the label, violate the second prong of the conflict issue, which is they violate or they're inconsistent with the executive agreement between the U.S. and Germany and the War Claims Act of 1928. That's an entirely separate prong of conflict that is separate from the label. Let me just tell you this. You see, the way I look at this, first of all, I don't see any conflict with federal policy. The claims agreement and the settlement agreement, they don't cover insurance claims by Armenian genocide victims. They cover German property that was in U.S. possession. So we don't have conflict preemption because, for another reason, there's no executive policy to the contrary. You've got presidential letters, but I don't know that they're sufficient to establish presidential policy. Then when you come to field preemption, the state is acting within an area of its traditional competence, statute of limitations for insurance-related claims. And these are garden-variety private property claims, which the Alperin case distinguishes from the war-related claims. I could answer all those if you'd like. First, with respect to there being no conflict with the War Claims Act and the executive agreement, the executive agreement covers all claims by all U.S. nationals against all German nationals. The claims here are brought, with one minor exception, by U.S. nationals. The Deutsch case went exactly on that issue. It said if you have claims covered by a treaty, the claims agreement is a treaty or an executive agreement, if you have claims covered by that, that is the resolution for the entirety of the United States. Executive agreement is a treaty? The executive agreement is constitutionally the equivalent of a treaty. That's what the court said in Garamendi, which was only involving executive agreements and not necessarily involving executive agreements, which was only with respect to the resolution of a war. Now, obviously, it was 50 years after the war, the executive agreements in Garamendi. But Garamendi says two things about that. Going back to the scope of the agreement, it says all claims by U.S. nationals versus German nationals. The Deutsch case says if U.S. nationals cannot bring a claim as a result of an end-of-war resolution, no foreign national can bring a claim because it is the resolution for the entirety of the U.S. We're not going to treat foreign nationals better than U.S. nationals, and in any event, it will come out of an American court. But coming out of an American court has the same problem. The second issue with regard to precedent... The same problem as what? Has the same problem as having a U.S. resident who's covered specifically by the executive agreement bringing a claim in a U.S. court. It is not better to have a U.S. judgment being brought to a foreign country, which would take offense to that, just because the residency or the nationality of the resident of the person bringing it is foreign as opposed to U.S. when they're using foreign courts. The second issue with regard to the presidential letters is that it is very clear out of the Garamendi case that there need not be a treaty. Executive agreement was all that was involved in Garamendi, and Justice Souter has a specific reference to the fact that, in a footnote, that it need not be treaties. It is the policy that one focuses on, the policy that is expressed by the executive, however that policy may be expressed. Presidential letters are a rare thing. The president doesn't write letters every day saying things that were said here, which is to reference an Armenian genocide would endanger the interests of U.S. troops, would endanger the ability to supply U.S. troops, and which would create complications in U.S. foreign policy in the Middle East. We all know how difficult an area that is. When the president, and it's not just one president, it's President Bush, but it's also President Clinton, that letter was signed on to, that position was signed on to by every living secretary of state, sent a letter to Congress, including Secretary Christopher, including Secretary Shultz, on all sides of the spectrum. So there's not really a serious issue here about whether there is an express and clear policy. There is a very clear policy. Do you know what would happen here then if this suit went forward? You're telling me our troops are in danger? That's what the president says. Who's going to endanger them? I think Justice Souter says at the end of the Garamendi opinion, it is not for us, in his case the Supreme Court, to decide whether that presidential policy, that executive policy, is one we agree with or not. If you don't like it, he says, go to the president or go to Congress. For the court's purpose, when the president expresses a policy view with regard to foreign policy, which is something under the Supremacy Clause is the president's right to do, and there's a requirement obviously that we speak with one voice in questions of foreign policy. If you don't like what the president does, that's who one should see. But what Justice Souter says, it is not for the court to decide the president's view of his foreign policy is wrong in this kind of circumstance. The last issue you raised... Why do we have committees in the Congress and in the Senate that deal in foreign policy? Are they just superfluous? They are superfluous when it comes to dealing directly with foreign nations and foreign issues. And in this case, and this is something that was pointed out in Garamendi's decision, too, by Justice Souter, there has been absolutely no adverse reaction by Congress. It's not as if Congress said, Mr. President, we don't want to do what you've just told us to do. What Congress has done instead, each time when President Clinton went to them, when President Bush went to them, several occasions in 2000 and 2003 and 2007, and each time when they said, please do not pass this resolution, Congress did not pass the resolution, didn't even bring it for a vote. And Justice Souter tells us in Garamendi that that is a significant issue that one must pay attention to. None of these came close to passage. So, so far as we're concerned on this record, given that history, it seems to me one thing is very clear. There is one U.S. policy. That U.S. policy is not to describe the events of 1915 to 1922 with the label of the Armenian Genocide. Whether we agree with it... In the overall scheme of things, politics trumps morality. Well, I'm not saying that at all. I'm saying in the overall scheme of things, the founders decided that structurally, and this is a constitutional structural question, structurally, the reason, one of the reasons the Articles of Confederation were deemed to have failed was because there were too many voices speaking to foreign policy. And that it was important that the new United States have a single voice. And that single voice is expressed in the executive. As to whether there is a question of morality or not, we'll have to leave it to others. But the point is, if there is a question of that, that is something that should be presented to the president or to the executive in general. It is not something that any court or any state legislature has the right to decide upon. And I think the answer is obvious. We might decide that we like the morality of this particular statute in California. We might not like the morality of statutes that could have come out of 1960s Mississippi or Alabama with regard under Governor Ross Barnett or people like that. The fact that we happen to like a policy from one state doesn't mean we'll get the same policy out of other states. These are very diverse states. And the whole point of the structural issue is that there has to be only one voice, not 50, not 12, not five. The policy here is that California is stating that this is an insurance claim. You have people here who have insurance claims for insurance-related claims. And so what California is saying is that, you know, we deal in those claims. They're private property claims. And we're certainly competent to handle those claims. Every case decided by every court in California or in the Ninth Circuit or in the district court involving these statutes relating largely to insurance claims but end-of-war claims, every case but this one has knocked the statute down. If the words Armenian genocide were removed from the statute, where would we be? We would still be in the same position because it creates a special cause of action for a special group of people, treating them differently relating to foreign affairs, relating to the resolution of a foreign conflict in which the United States has decided to have a different resolution. The U.S.'s resolution was to have the Mixed Claims Commission. And the Mixed Claims Commission does not have private litigation. There is no private right of action. That's the U.S. policy going back to the 20s. This position, and this is a position that was clear in Deutsch. It is clear in the Dermijian case also involving Armenian issues by Judge Morrow. What is absolutely clear is that the U.S. position is what I've described it as historically. And when there is a position by the United States with regard to how you resolve war claims, no state can decide to give a better or different remedy. They can't give a worse remedy, and they can't give a better remedy. This is a much better remedy. This is a remedy. Judge Morrow dealt with it in the Dermijian case. And she threw it out on the same grounds we're arguing here, on conflict grounds. So, and I did want to reserve a few minutes, but I'm getting to the end. Eventually going to get to constitutional exclusion? Is that your third ground? The field preemption? Pardon me? Field preemption? Is that what you're referring to? Or the statutory provision? Well, I was referring to the constitutional right of the executive to deal with foreign policy. Yes, yes. That's what we call field preemption. We think that is something the Zschernin case deals with in 1968 by the Supreme Court, and essentially was a 7-2 decision. Normally that is a separate ground. It is a branch of preemption. The question in Zschernig and in Garamendi is they say we can have field preemption in which, even though the U.S. has not done anything, has not taken any position, it is something in which the states should not be involved. In that case, in Zschernig. Under the Constitution, it's a matter of foreign policy reserved to the executive. It's under the Supremacy Clause, and it's reserved to the executive to deal with foreign policy, and the states may not, even though in Zschernig it was a question of probate succession, so a traditional state remedy, and a traditional state area, and the court on a 7-1, I believe, vote with one person sitting out, Justice Marshall, 7-1 vote when you count everybody up says we're not going to permit the states to involve themselves here, even though there is no U.S. foreign policy on the issue, and even though the solicitor general filed a brief saying we don't care about this. Here, of course. Usually that field preemption, it seems to me, would come into under consideration when you have the federal government actually doing something in the area, and you would say that's probably getting into the conflict, but that the government by its acts had preempted the field totally, and the state could not act. But I think if there is no federal action at all, then you would analyze it, I think, under the constitutional exclusion of the foreign policy, but I'm not sure. No, I think that's right, Judge Thompson. I think that's absolutely right. What Zschernig and Garamendi tell us, and Deutsch to some extent, is that when there is absolutely nothing there, there is a branch of preemption that says here the state shall not tread, such as there are dragons beyond this line, don't go there. When you have actual federal action, then it's easy to fall into the analysis of is there a conflict between the federal action and the state action. We have both here. That is, if it's an area of sensitive foreign relations, you will always have field preemption, even if the federal government hasn't acted. So if the federal government hadn't acted here, and you said there was no federal policy, as Judge Pragerson posited, in that circumstance, field preemption could be appropriate because it's an area in which the states should not tread, even though the federal government hasn't. Here ‑‑ In Deutsch, I think we said the question was one of a lack of state power. Yes, absolutely. And that would be the situation. And that would be the situation. That's why it's field preemption. There is only federal power and no state power. Okay. Well, you call it field preemption. I call it something else. I think we're talking about the same thing, and I don't think we need to get hung up on labels. Well, you're the senior partner, so we'll go with that. But then, of course, you always have the conflict preemption, and we have the two branches of conflict. You don't need that here. You don't need that. If you go on field preemption, you do not need that. I think Zschörnig is clearly a field preemption case. Deutsch, I think, is a field preemption case. And Garamendi says, well, there is field preemption. Depending upon how strong the state interest is, we have a sliding scale. And I do want to, if I may, take a little more of your time, respond to Judge Pragerson's last point about traditional competence, because that's something the court spoke about in Garamendi. And let me say why this statute is not in the area of traditional competence. I think it's oversimplistic to say it is a statute of limitations. It is not a statute of limitations only. It creates a cause of action, just like 354.6 did in Deutsch. It's almost identical. In 354.45, dealt with in the Dermagian case, Judge Morrow says the same thing. That is almost word for word the same statute as here. It also deals with looted bank assets relating to Armenians and Turkey, as opposed to insurance policies. But if you put the two next to each other, the wording is almost identical. There is a creation of a specific cause of action that is unlike any other cause of action that we have. Normally, we have a cause of action that says anybody who has a particular general category of harm imposed upon them can bring a claim within so many years or so many days from the approval of the cause of action. That's not what this statute does at all. First of all, it says there are existing statutes of limitations, and it suspends them by its terms. It says they shall not apply. Not that they aren't here, but they shall not apply. The second thing it does is it creates a very odd statute of limitations. The normal statute of limitations says you have, say, four years in California for a cause of action for breach of contract after the accrual of the breach. However, this does not say that. This says no matter when your injury occurred, you have until 2010 to bring your claim. So if your injury occurred in 1915, you have a 95-year statute. If your injury occurred in 1922, you have an 88-year statute. That is not a traditional statute of limitation by any measure. The other thing is traditional statutes of limitations do not deal with nationalities. They do not say only particular people of a particular nationality or a particular ethnic group who have a claim relating to a particular type. That is, who died in Armenia or Turkey in a set period of time can bring a claim. What it says in a traditional statute of limitation is from the date of the event, whenever that may have occurred, wherever it may have occurred, if you have jurisdiction in California, you can bring a claim, whether it's four years, six years, or eight years. The claim isn't against the Turkish government. The Turkish government takes the ‑‑ I assume you saw the letter that came from the Turkish ambassador. If there's any doubt, any doubt whatsoever, that this creates a foreign policy problem, one need only look at a NATO allies letter from their ambassador to the U.S., which was approved by the Turkish prime minister just last week. The Turks, whether or not we think it is a good thing or right or fair or not, the Turks take offense. It is a criminal offense in Turkey. If we do ‑‑ the Turks last year in 2000, in October of 2007, recalled their ambassador when Congress was about to take a vote on the House resolution. Recalling your ambassador to Ankara is a significant diplomatic event. And what Garamendi teaches us is it is not for any of us to deal with that. It is for the executive to deal with that. Whether it's President Bush or President‑elect Obama when he takes office, but there are issues here relating to the Middle East in a volatile area that our one significant ally, which permits us to land planes, to refuel, and to resupply troops in Iraq and Afghanistan, takes offense at this statute. That seems to me to clearly implicate foreign policy under any interpretation of it. The clarity show that given the president, two presidents have consistently said, we don't want to do this, exactly for that reason. We don't want the Congress to say Armenian genocide because it will upset the Turkish government, and we need to keep good relations with the Turkish government. That is a much more direct ‑‑ Otherwise we'll be checkmated, huh? Otherwise it is for the president to decide how he makes that decision. What he says, though, is it will complicate our situation. And presidents on both sides of the political fence, secretaries of state on all sides of the political fence, Secretary Gates in his letter last year, who will be the ongoing secretary of defense, all of them say this will make our lives in the Middle East more difficult. When the executive says that in a situation in which we are unfortunately at war in two different nations in that area and do not have landing rights wherever we may want them to be, that is something that directly implicates foreign policy. This statute is inconsistent with the exact words, the exact words that the executive has complained about, putting aside the question of whether we have, as Judge Thompson describes it, a broader preemption under the Supremacy Clause, and putting aside whether we have an issue here relating to the remedial question, permitting litigation over World War I-related claims when the U.S. has had a statute and an executive agreement with Germany that says in this case, that applies to this case, U.S. people cannot sue Germans except through that means that was set up by the Mixed Claims Commission.  Recall that one of the issues... We never had anything like that vis-à-vis the Armenians. We did not have anything like that against the Armenians, but what Deutsch tells us, remember in Deutsch there were claims brought by Chinese residents and Korean residents. They weren't a country then. I don't think it makes any difference. What Judge Reinhart said in Deutsch was if the U.S. has prevented U.S. residents from bringing a claim as they did against Japanese companies under the Treaty of San Francisco. When the U.S. has done that, that is the resolution for the entirety of the U.S., and the fact that there are some Chinese... Did we do that here? Yes. Did we do that here? Yes. Did we do what you just said we did with the Japanese claims? Yes. Did we do that vis-à-vis the Armenian claims? Yes. That is, we did not do... We did not have... We had a resolution for claims between Americans and Germans. As long as there is a claim between the Americans and the Germans, there's a narrow ground here because it wouldn't apply if there were not Germans, but as long as we have a claim between the Americans and the Germans, Deutsch tells us it's barred, even though the person bringing the claim is an Armenian who is bringing it into U.S. court just the way it happened for Chinese. There was no remedy for the Chinese in the Treaty of San Francisco. There were no remedy for Korean slave laborers in the Treaty of San Francisco. In both of those cases, Judge Reinhart looked at it, and for a unanimous panel said... We don't have a treaty here. We have an executive agreement with... Well, there are a variety of treaties. There's a treaty of Berlin that involved Germany. There's the executive agreement about how to deal with claims. We don't have a treaty that involves the Armenians. We didn't have one that involved the Chinese in World War II, and Deutsch says their claims were barred. We didn't have one that involved the Koreans in World War II, and Deutsch says their claims are barred. And the reason they're barred is because all American claims against Japan were barred. And here, all American claims against Germany are barred. If American claims against Germany are barred, then nobody in the United States can use a U.S. court to bring a claim against Germany, even though they say when that claim arose, it was an Armenian claim. That's exactly what Deutsch specifically says may not occur. There's a D.C. circuit case that says the same thing, and in fact, the Justice Department filed a brief that said it was not the intention of the Justice Department or the executive to say that non-Americans can bring claims that Americans cannot bring. This is not a case in which we could say to Canadians, come on down, you can bring a claim, but Americans who fought that war cannot bring that claim. That's just out there in Deutsch. You'd have to overrule Deutsch to say that it made some difference because those were Chinese and Koreans, and here we have Armenians. They're both in the same legal box. I've taken a lot of your time, and I apologize for that, and I'm happy to answer some more questions, and perhaps you'll give me a few minutes to rebut anything. There are statutory arguments as well. They're fully briefed, and I don't know that really much is added about the scope, both whether Muni Gray is an appropriate defendant because it was not an insurer, did not sell insurance policies, and whether these plaintiffs are convicted. You don't have to argue that. Thank you. Good morning. May it please the Court. Brian Kabatek appearing on behalf of the Respondent Petitioner or the Respondent Class. Your Honors, I think we need to start by, first of all, dispelling, despite the fact that my opponent here believes that this case is somehow going to affect our troops.  My learned assistant. My learned opponent. My well-schemed opponent believes that this is somehow going to affect the troops on the ground in Iraq, the events going on in the Middle East, and, in fact, the day-to-day power of the President of the United States. This is nothing more than an insurance case, and this is nothing more than a statute which in passing mentions the Armenian Genocide as an event, but doesn't, as he suggests, limit itself to people of Armenian descent. In fact, it says Armenians and others in the statute, and despite the fact that he believes this is Who were beneficiaries of policies written in favor of victims of the Armenian Genocide? Persons that resided in the Ottoman Empire during the time of the Armenian Genocide, which is a defined period of time in the statute that occurred in that region between the 19th century and the early 1920s. 1920s. Those would be Armenian people, wouldn't they? Not necessarily. Greeks. Oh, I see. It could be Greeks. It could be other people who were affected by what's come to be known historically as the Armenian Genocide. Now, this is not the only statute that a state has entered into which mentions the Armenian Genocide. Thirty-nine states have acknowledged the existence of the Armenian Genocide. In the letter of which my learned, esteemed opponent speaks from the ambassador of Turkey, in the last paragraph specifically says, We, Turkey, generally do not take a position with respect to state-by-state acknowledgement or recognition of these events known as the Armenian Genocide. What should we do with that letter? I mean, the letter was not provided to the district court. It's been provided to our court. Do we take judicial notice of it? How do we consider that letter? I don't even know if the letter, Your Honor, is authentic. I mean, I assume it is. I don't know it's authentic. It arrived on Friday, so we'd object to that letter as coming into evidence in this case of this proceeding. Well, I don't know that we can take evidence. I think the only way we'd get it would be probably by judicial notice, but I'm not sure it's the kind of thing of which we should take judicial notice. Well, anyway, I don't know whether you object to the letter or you don't object or you think it's grand. We object to the letter. Okay. I was simply pointing out in that last paragraph, even Turkey acknowledges that state-by-state recognition of the genocide is not something that they've taken a position on. The United States government hasn't taken a position on the revival of the statute of limitations, and that's all this is, is a revival of the statute of limitations to bring insurance and insurance claim. It's not a new cause of action as is claimed this morning sort of for the first time. What we do have, though, in this Armenian genocide is, or this statute pertaining to the Armenian genocide, is the fact that two cases have previously settled, have litigated fully, and resolved, not once affecting the foreign powers of the United States. The federal government's taken no position in those cases. There's no positions being taken with respect to these cases and our relations with Turkey. It seems to me that this is an attempt to take the United States' neutrality on the existence of the Armenian genocide and spin that into something that's going to assist a German insurance company in not paying about 271 claims left over from that period of time. And that's all this is, and it's nothing more than that. The cases that they cite, the Deutsch case, for example, let's discuss that for a moment. That involved slave labor. That involved the state of California devising a new claim or cause of action for slave labor claims against Japanese companies. This case is not establishing a new cause of action. It's simply reviving a cause of action which existed in law and has existed in law since the field codes of New York were adopted in California in the 19th century to litigate life insurance claims that were unpaid. That's all this case is. As much as we try to build this to be something more, it's not. And we certainly have never tried to build it into something more. You know, these cases that are all talked about here are World War II-era cases. And I'm certainly not arguing or taking a position on the next case on the Court's docket. But the World War II-era treaties, the events that took place after World War II, were very complex. Dozens of treaties that occurred. Dozens of positions that the federal government took on a war that actually ended. And as we know, World War I never really even ended. There's no cases that pertain to treaties regarding the termination of World War I. Now, they want to point to this Treaty of Berlin. Well, I wish you wouldn't say that, because my father was badly wounded in the last great battle. And he thought it ended. And he thought it was the war to save democracy. And to end all wars. And to end all wars. And yet, on the 11th hour of the 11th day of the 11th month, fighting simply ceased. And there were some treaties at that time. And this treaty that they point to, the Treaty of Berlin, specifically pertained to reparation claims. Not to life insurance. And reparations by its definition is payment for losses incurred as a result of the fighting, as a result of the war itself, between Germany and the United States. Now, if their logic is correct, that a treaty between Germany and the United States is intended to extinguish life insurance claims of persons at the time living in the Ottoman Empire, the Ottoman Empire, Turkey, was an ally of Germany. So a treaty they're claiming between the United States and Germany would actually in order the benefit of Germany's ally in the First World War? I think it's fairly tautological. It's fairly circular in its reasoning to think that that treaty would apply. The real issue comes down to was this case one that has anything more than an incidental effect on the foreign policy of the United States? If any effect at all. And the question I have with that, with respect to that, is where is the proof or the evidence, other on the fact that the United States government has gone neutral on the Armenian genocide? There's no treaties. There's no position taken on that. The cases that they cite repeatedly, like, for example, Zernick, the probate case, that involves a direct treaty between the United States and certain nations about the intestate succession of property after death. The Garamendi case, a comprehensive insurance scheme that was developed between Germany, France, Austria, and the United States to set up the International Commission on Holocaust-Era Insurance Schemes. Sadly, the Armenians have nothing like that. All the Armenians have are a handful of policies that are the subject of this litigation that seem to be left as a result of the events that occurred in Turkey. Do you try to settle these cases? We've settled two of them. We've recovered over almost $40 million so far from New York Life and from a French insurer named La Union V, now owned by AXA. I've tried to reach out to them to see if they would pay these 270 claims, and instead they want to argue here that this affects American policy. How much do they total? In U.S. dollars, 1915 dollars, my best estimate is less than a million dollars. Less than what? A million dollars. All 271? They're small policies. Insurance, in the turn of the last century, life insurance was a relatively new concept. And the purpose of these policies were not to widely provide for people for the rest of their lives if their spouse dies or their father or parent dies. Instead, it was supposed to be enough money and to get on with a new life. And at the time, the reason these companies sold to ethnic Armenians in Turkey was the Turks were Muslims and they didn't believe in life insurance. And secondly, there already were hostilities between the Turks and between the Armenians, and the Armenians hoped that by purchasing these life insurance policies, if they passed, that their families would have a few Turkish rubles, that's the currency, to leave the country and start a new life. And that's all these are. They're relatively small policies. We're taking a small issue 90 years ago and turning it into the end of relations with Turkey and the fall of the Middle East as a result of this case. And as I say it, it sounds absurd. Is it more than an incidental effect on foreign policy? If the court has any questions. What if the words Armenian genocide were omitted from the California statute? Then they would have no argument that this affects foreign policy in any way, shape or form. I don't know how those words have more than an incidental effect on foreign policy. Well, Turkey doesn't like that, those words. Strangely, though, Turkey doesn't like the phrase Armenian genocide. Yet, they even acknowledge in this letter that I've objected to, that they don't have an objection with individual states. I'll read from the last paragraph. Turkey has not as such protested state proclamations on this historic controversy because it conducts its foreign affairs directly with the U.S. federal government, primarily the executive branch. Turkey doesn't care that 39 states have acknowledged the Armenian genocide. A proclamation of the Armenian genocide by a state is a more significant event than simply a statute which says insurance policies are revived as a result of the quote, unquote. Let me ask you this. I have some questions that Judge Nelson asked me to ask. And this is a question for you. Assuming that it is the policy of the federal government not to recognize the Armenian genocide, how does the explicit recognition of the genocide in the state statute not conflict with this policy, assuming that there is that policy? Assuming the federal government has taken a firm policy not to recognize the genocide as opposed to go neutral, the mere mention of the Armenian genocide in this state statute and the 39 other states that have recognized the genocide seem not to conflict with federal foreign policy because the federal government has never taken a position on that. If they felt as strongly as my learned opponent thinks they do, if they meaning the federal government, either the executive branch or Congress, you think that once in 39 instances the federal government would issue a letter or request that a governor not sign a bill that pertains to proclamations or recognition of the genocide. And that has never occurred once. All right. Other questions? If not, Your Honors, thank you for your time. Okay, well. Let me read the report. Let me ask you that question. This is a question that Judge Nelson asked me to put to counsel. The federal policy against recognizing the Armenian genocide appears to be based on executive communications with Congress, not on any formal executive agreements. Would a finding of preemption in this case thus require an extension of Garamendi? I don't think so. There's a footnote in Garamendi that says something very specific. It says, this is in the majority opinion, it says what we are giving effect to is not a particular document, but a policy that happens to be expressed by the executive through a particular document. In Garamendi, much of the evidence involved letters from Deputy Secretary of State and later Deputy Secretary of Treasury Stuart Eisenstadt, who was involved in Holocaust issues. And he wrote letters expressing President Clinton's views on these issues. And the court gave great credence to those letters and was very careful to say that when it comes to issues of foreign policy, one need not have a particular document. If you look at the history over our 200 and some years, you have treaties, you have statutes. Treaties, obviously, are obvious. Statutes most recently came up in the Crosby case in the Supreme Court in 2000. Which also raised foreign affairs issues. In Garamendi, you have executive agreements. It says we've been doing executive agreements in foreign affairs since 1789. And then Justice Souter goes on to say, but it's not the form, it's the substance. And when it comes to foreign policy, that obviously makes sense. Is there an extension in the sense that this case would involve statements, letters by the President and letters by the Secretary of Defense and letters of the Secretary of State without an executive agreement with regard to the Armenian Genocide Branch, not talking about the War Claims Branch? Yes, it is a minor extension, but it is not an extension in kind. It is an extension merely in form, because Garamendi tells us differently. On the War Claims Branch, of course, we have an executive agreement. And then there's the War Claims Act of 1928, which is a statute, which funds the Mixed Claims Commission out of the executive agreement of 1922. Well, is that the case, then, that all these little policies add up to around a million dollars? We have never seen a single policy. There is no existing policy. There has never been a description of a policy number. I have never seen anything of that sort in any amount or number. If there is a policy, we ask for them, and we've never seen them, period. End of discussion. I cannot answer that. I don't know where that number comes from. I don't know of a single policy that exists. Certainly no policy can exist with regard to Munich Reinsurance, because Munich Reinsurance has never in its life issued a policy, period. End of discussion. Full stop. So there's no policy with my client. Whether there's a policy with Victoria from a hundred years ago, we ask for all policies and we never receive them. That's obviously not on the record, and I don't want to suggest otherwise than it is. I would like to read from the letter. Well, I mean, is that offer given serious consideration? There's been no offer, Your Honor. There's never been a discussion. Well, you just heard one here, didn't you? I heard a statement that said the face value of those policies, without ever identifying those policies, is a million dollars. In 1915 dollars. It doesn't say anything to me about a settlement offer or a claim or anything we have anything to do with. I thought I heard him project that value to the present-day value of the dollar. I didn't hear that. But in any event, we never received it. We don't know that there is a single policy out there. I know my client does not have a single policy out there. I absolutely know that. It doesn't because it's never written a single life insurance policy in his life. You know, when the people are running away, they're not going to grab their little life insurance. No, it's a different issue, Your Honor. Munich Reinsurance is a reinsurer. It does not issue policies. It never issued policies. It only buys risks that other insurers have in policies they've issued. It is impossible for Munich Reinsurance to have issued a policy to any member of the class. It never issued a policy to anybody. I'm not disputing that. So, you know, whatever offer is in there, it has nothing to do with our policy. I know what a reinsurer is. If I can read the rest of the paragraph that Mr. Kavicek quoted. This is the letter? The letter, yes. And I'd be happy. Asking us to take judicial notice? I think, well, Your Honor, it's the Turkish government's letter. It expressed its views, for example, in the Darmadian case. It submitted a similar letter. I know what it's all about. I'm just wondering how we consider it. Well, what I would suggest is this just came in on Friday or Thursday. We'd be happy to submit a short memorandum explaining how the court could take consideration of it and what its significance is. It's not your normal situation. It is a diplomatic communication. I have to tell you, I'm not sure. I haven't read that letter. I don't know if it came to my office or not. The clerk's office told us it was received and transmitted to the panel. And that's what the docket indicates. Well, it could have gone, you know, by time.  Right. I think it came in Thursday. But we can get you another copy. You know, I'm way out in Woodland Hills, a long distance. You're a neighbor of mine, so I could drop it off on the way home if you'd like. That will create an international incident. Yes, yes. But if I may, on the assumption that we have a copy. Okay. We will give it to the clerk. The last paragraph, though, which Mr. Kabatek just read and said, Turkey doesn't care about the resolutions. I'm going to read it in full. Finally, Turkey has not as such protested state proclamations on this historic controversy because it conducts its foreign affairs directly with the U.S. federal government, primarily the executive branch. Read you that. What he didn't read is, What the Turkish government is saying there is, we deal with the United States. We don't deal with the individual states. We have an ambassador to the United States, not an ambassador to California and a different one to Wyoming and a different one to Alaska. So the Turkish government has said, we don't like these, but as a matter of our structure and a matter of our relations with the government, we don't deal with them in that way. The Turkish representatives say here or in other big cities, they don't communicate at all with the Armenian communities. Oh, I believe they probably do. They don't communicate. They don't lobby states. That is, they don't consider that their relations with people within the United States involving lobbying particular states as opposed to dealing with the federal government, which I think is a very But they do communicate with Armenian communities. I actually don't know the answer to that. I assume they do from other things that I've seen, but there's no way for me to know. They're not my client, obviously, and they don't tell me who they communicate with or who they don't communicate with. I believe from the letter, it says there is communication going on on an ongoing basis, trying to get reconciliation between the Turks and the Armenians. The Secretary Gates' letter and Secretary Rice's letter refer to the fact that they believe referring to Armenian genocide will interfere with reconciliation efforts between the Turks and the Armenians. So that is obviously something that's going on. I can't tell you whether it's going on in California or not. I think the fact that the case is settled with other insurers has absolutely nothing to do with the foreign affairs issues that are involved here. But I do want to read a little bit. If you look at our brief, we have a series of quotations. This is not a fictional issue about whether the United States government cares about this question. There are letters from the Secretary of State in the Clinton administration and the President. If you look at the language of those letters, they do not suggest that this is, we don't care about this minor issue. They suggest that we care very much about this minor issue, and it may be, to my esteemed opposing counsel, it's just an insurance case. Wars start over very insignificant issues at times. It is not for any of us to decide that we all think we know it is just an insurance issue. To the Turks, it is not. And last year, when they withdrew their ambassador and said they were going to cut off access of U.S. planes to Turkey, on this very issue, it doesn't matter whether they were right, wrong, reasonable, or unreasonable. It is their view. They have a right to their view in dealing with their territory and whether our planes can land on their territory. And Justice Souter tells us this is not the issue for the courts to decide. That's the issue for the executive to decide in the political branch. Thank you very, very much. All right. Now we'll stand submitted. Now we come to Shahr. All right, we'll, we'll, they say in the Navy, all ashore that's gone ashore. See, as soon as you get up, you lose half your audience. And everybody can have seats, Your Honor. Let's let everybody get a seat and settle down. Got some room over here in front if anybody wants to sit down. Well, I should send a young lawyer over there that could be interviewed for a job. Okay. Got enough seats there? All right. Okay.
judges: Pregerson, Nelson, Thompson